IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES ANTHONY ANDERSON, JR.,

         Plaintiff,                    OPINION AND ORDER

v.

                                                 19-cv-1048-slc

ANDREW M. SAUL,
Commissioner of Social Security,

         Defendant.

---

       Plaintiff James Anthony Anderson, Jr. is seeking review of a final decision by defendant Commissioner of Social Security denying his claim for disability insurance benefits (SSDI) and supplemental security income (SSI) under the Social Security Act. 42 U.S.C. § 405(g). Anderson contends that the administrative law judge (ALJ) who denied his claim erred by: (1) not providing good reasons for discounting the opinions of Nurse Practitioner Monica Gorski and consultative examiner Kurt Weber, Ph.D. in favor of the outdated opinions of the state agency consultants; and (2) failing to support his listing analysis with substantial evidence. For the reasons explained below, I am affirming the ALJ's decision.

       The following facts are drawn from the Administrative Record (AR), filed with the Commissioner's answer in this case:

**FACTS**

**I. Applications for Benefits and Procedural Background**

       Anderson filed applications for SSDI and SSI on September 8, 2016, contending that he had been disabled since June 16, 2016 because of posttraumatic stress disorder (PTSD), attention deficit disorder (ADD), bipolar disorder and anxiety. AR 13, 215, 223, 254. Anderson was born on October 19, 1972, making him 43 years old on his alleged disability onset

date. AR 21. Anderson has prior work experience as a bending machine operator, store laborer, and forklift operator. AR 21.

In a function report dated October 24, 2016, Anderson stated that he has difficulty completing tasks, concentrating, remembering, understanding, following instructions, and getting along with others. He wrote that he confronts others when he feels disrespected, cannot pay attention for extended periods, and does not maintain relationships with family. Anderson also stated that he served an extended prison sentence (22 years), which he found to be very isolating. AR 262-69.

On December 14, 2018, ALJ Michael Hellman held an administrative hearing at which Anderson and a vocational expert (VE) testified. AR 29. Anderson was represented by counsel at the hearing. He testified that he does not like interacting with people, has angry outbursts if he feels disrespected, and does not have long-term contact with anyone except his girlfriend. AR 59-60. Anderson claimed that he has several different personalities that he changes into a few times a day as a result of the isolation that he suffered while imprisoned for 22 years. AR 61-64. He stated that both his treating nurse practitioner (Gorski) and his girlfriend (Linda) are aware of these personality changes. Anderson also testified that his ADHD made it difficult for him to finish a task before moving onto the next. AR 76-77.

In a written decision issued on March 26, 2019, the ALJ concluded that Anderson was severely impaired by bipolar disorder, dissociative identity disorder (DID), attention deficit hyperactivity disorder (ADHD), and PTSD, none of which met or medically equaled the severity of a listed impairment. AR 15-18. The ALJ reviewed the medical record and the opinions of nurse practitioner Gorski, a consultative examining psychologist (Dr. Weber), and the state

2

agency reviewing psychologists (Drs. Palreddy and Jacobson). The ALJ determined that Anderson had the residual functional capacity (RFC) to perform a full range of work at any exertional level limited to: understanding and remembering simple instructions; maintaining attention for simple, routine tasks for two hour segments over the course of a routine 8-hour workday and 40-hour workweek within acceptable attention, concentration, persistence, and pace tolerances; adapting to simple and routine work changes; occasional interaction with supervisors and coworkers; and no one-to-one interaction with the public on a sustained basis. AR 18. Relying on the testimony of a vocational expert who testified in response to a hypothetical question based on the RFC assessment, the ALJ found that Anderson could not perform his past relevant work but could perform work in the representative occupations of laundry worker II, recycling/salvage laborer, and production helper. AR 21-22.

## II. Medical History and Treatment

Nurse Practitioner Gorski (formerly Hofmann)[1] is Anderson's primary mental health treatment provider. Anderson first saw her on April 13, 2015 for a behavioral health intake assessment after he presented to the emergency department on April 1 for a panic attack. AR 393, 396. He reported a history of trauma and symptoms consistent with PTSD and anxiety. AR 396. Gorski assessed Anderson with a Global Assessment of Functioning (GAF) of 41-50[2]

---

[1] At the hearing, Anderson testified that Gorski previously went by the last name of Hofmann. AR 67. Anderson's medical records show that she began using the name Gorski in 2017. *See* AR 813.

[2] "The GAF is a 100-point metric used to rate overall psychological, social, and occupational functioning, with lower scores corresponding to lower functioning." *Lanigan v. Berryhill*, 865 F.3d 558, 561 n.1 (7th Cir. 2017) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32–34 (4th ed., Text Rev. 2000)). A score of 41 "signifies serious psychiatric illness" while a score over 65 "signif[ies] 'mild symptoms' and 'generally functioning pretty well.'" *Voigt v. Colvin*, 781 F.3d 871, 874-75 (7th Cir. 2015). As the court of appeals has observed, the American Psychiatric Association

3

and prescribed him Zoloft, Ativan, and Concerta. AR 400. When Anderson returned on May 14, 2015, Gorski's examination showed that he had a blunted affect and a sedated sensorium, so Gorski replaced the Ativan with Klonopin. AR 402-03. By June 16, 2016, Anderson reported that he was feeling a lot better and that the medications had changed his life: his mood was great, work was going well, he was thinking clearly and sleeping well, and his motivation and energy had increased. AR 407.

On November 17, 2015, Anderson reported to Gorski that he had recently had a panic attack at work, which caused him to quit his job, but that he returned to work a short time later. AR 463. When Anderson returned to see Gorski on March 17, 2016, he reported his symptoms were hard to deal with and he was stressed in making everyday decisions. However, he had no significant depression or panic attacks and was doing "pretty well." AR 475.

On April 28, 2016, Anderson told Gorski that work had become more stressful because he had switched to third shift; although he was getting along with his supervisor and coworkers, his anxiety sometimes took over. However, his girlfriend reported that he was not "cycling" as in the past. AR 478. On June 23, 2016, he told Gorski that his mental condition had worsened and that he was not adjusting well to third shift. He was experiencing racing thoughts, mood swings (ranging from emotionally withdrawn to anxious), chaotic sleep, and increased irritability. AR 480. On July 18, 2016, Anderson reported that his job had not been able to offer him a shift

---

has abandoned the GAF scale as a measure of functioning because of the scale's "conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014). *See also Green v. Saul*, 781 Fed. Appx. 522, 527 (7th Cir. July 23, 2019) (upholding ALJ's decision not to credit GAF score because it "is a subjective test that can differ from one clinician to another").

since June 30. He believed that he was being denied work because of his mental impairments. AR 483.

By August 15, 2016, Anderson reported poor sleep, worsening attention, and a reduced tolerance for criticism. He had taken out cash loans for an antique flipping business that he was starting with his girlfriend, Linda. AR 486. Linda told Gorski that Anderson was not thinking clearly, spending money they did not have, and that things had been "awful." AR 486-87. Gorski's examination revealed that Anderson had poor concentration, an elevated and agitated mood, upbeat speech, focused thought content, and poor insight and judgment. AR 487. She questioned whether Anderson might have bipolar disorder currently in a hypomanic episode. AR 488. On August 18, 2016, Gorski diagnosed him with bipolar I, current or most recent manic, moderate-severe, and replaced his Zoloft with Seroquel. AR 491-92.

On September 15, 2016, Anderson reported that his anxiety had worsened after stopping Zoloft and that he was unable to afford his medications. Gorski restarted his Zoloft and increased his Seroquel. AR 500. On September 30, 2016, Linda called Gorski's office to report that she was worried about Anderson because there had been an altercation between him and the neighbors during which the police were called. AR 588. However, when Anderson saw Gorski on October 6, 2016, he stated that the incident had resolved without any further problems. He reported that Seroquel was helping and that he restarted Sertraline, which he found very helpful in keeping him calm. AR 586.

Anderson reported at various visits that he was feeling anxious and having panic attacks, dissociative episodes, and increased depression. AR 586, 759, 766-67. However, by November 17, 2017, Anderson reported that his medications (quetiapine, clonazepam, and lamotrigne)

helped him a lot, although he did say that Concerta was not effective any more. AR 814. His main concern was the interruption in his memory and concentration. He reported feeling "more mellow" on his medications but that he had more aggressive "urges" that came on quickly when he was not on the medications. *Id.* Gorski diagnosed Anderson with dissociative identity disorder, bipolar disorder, PTSD, and ADHD. AR 817. Anderson continued his treatment with Gorski through at least August 2018 and continued to experience interrupted memory in dissociative episodes, anxiety, racing thoughts, variable moods, and a short-term memory impairment. AR 820-335.

### III. Medical Opinions

#### A. Gorski

Gorski submitted one-paragraph statements on February 1 and June 6, 2017, in which she recited Anderson's diagnoses and stated that he was unable to work. AR 782-83. The ALJ gave these statements little weight because they are conclusory and commented on Anderson's general ability to engage in substantial gainful activity. AR 20-21.

On January 29, 2018, Gorski completed a mental capacity assessment for Anderson in which she checked boxes showing that he had marked limitations in several areas of functioning, including: following one-or-two step oral instructions to carry out a task, sequencing multi-step activities, working at an appropriate and consistent pace; ignoring or avoiding distractions while working; working close to others without distractions; working a full day without needing more breaks; managing psychologically based symptoms; setting realistic goals; cooperating with others; handling conflict with others; responding to requests, suggestions, criticism, correction,

and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. AR 785-87. She wrote that he had "very poor concentration"; "significant deficits in concentration, memory, organizing & sequencing tasks"; and was unable to complete things independently. AR 785-86. She also stated that he had "poor conflict management skills" and was "intellectually capable when he [was] clear-headed but it [was] very easy for him to become dysregulated, dissociated, or agitated to a point that he [could not] safely manage his symptoms." AR 786-87.

The ALJ gave the 2018 opinion only some weight because he found that the marked limitations assessed by Gorski were not supported by the medical evidence. He noted that apart from a reported conflict with some neighbors involving the police in 2016, there was little other evidence in the record to support a conclusion that Anderson had marked difficulty interacting with others. The ALJ found that even though Anderson suffered from moderate concentration deficits, his overall condition is largely controlled through medications. He also noted that Anderson had trouble working third shift but that there was no evidence that he was unable to maintain employment during other time periods. AR 21.

### B. Dr. Weber

On November 7, 2016, Dr. Weber performed a consultative mental status examination of Anderson with a special focus on PTSD and depression. AR 751. His examination revealed that his immediate memory, recent memory, concentration, insight, and judgment were within normal limits. He completed concentration tests quickly and accurately and had no problems following the conversation during the assessment. AR 754. In a collateral interview, Linda

7

stated that Anderson was socially withdrawn due to a lack of trust, had angry outbursts, and was very impulsive and somewhat apathetic. AR 755. Dr. Weber concluded that Anderson experienced: (1) mild limitations in the abilities to understand, remember, and carry out simple instructions and maintain concentration, attention, and work pace; (2) mild to moderate limitations in the ability to adapt to changes in the work environment; (3) moderate to marked limitations in the ability to respond appropriately to supervisors and coworkers; and (4) marked limitations in the ability to withstand routine work stresses. AR 756-57.

The ALJ gave this opinion some weight, noting that Dr. Weber had evaluated Anderson on only one occasion and that the record did not support the marked limitations in social functioning. The ALJ pointed out that there was no evidence of Anderson demonstrating significant difficulty interacting with supervisors or having other significant social limitations. AR 20.

### C. State Agency Consultants

At the initial level of review on November 21, 2016, Dr. Soumya Palreddy found that Anderson had moderate limitations in the abilities to understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to

changes in the work setting; and set realistic goals or make plans independently of others. AR 101-02. As additional explanation in the mental RFC assessment, Dr. Palreddy wrote that Anderson retains the ability to perform unskilled work. AR 102. At the reconsideration level of review on April 20, 2017, Dr. Jan Jacobson agreed with Dr. Palreddy's findings except for assessing a marked limitation in interacting with the general public. AR 116-20. Dr. Jacobson explained that Anderson is able to relate infrequently with coworkers and supervisors but is not able to deal directly with the public. AR 119. The ALJ gave both opinions great weight because they were well-supported by the record and relied in part on Dr. Weber's findings and a complete analysis of Anderson's treatment history. AR 20.

## OPINION

In reviewing an ALJ's decision, I must determine whether the decision is supported by "substantial evidence," meaning "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (citations omitted). This deferential standard of review means that the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [our] judgment for that of the Commissioner." *Deborah M. v. Saul*, __ F.3d __, 2021 WL 1399281, at *2 (7th Cir. Apr. 14, 2021) (quoting *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019)). We also do not "scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the administrative law judge must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (citations omitted); *see also*

*Deborah M.*, 2021 WL 1399281, at *2 ("[A]n ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability."); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must . . . explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

Anderson challenges the ALJ's evaluation of the opinions of Nurse Practitioner Gorski and consultative examiner Dr. Weber, as well the ALJ's finding that the severity of Anderson's impairments, either singly or in combination, did not meet or medically equal a listed impairment. Although Anderson's challenges are similar, I will discuss these issues separately:

## I. Evaluation of Psychological Opinions

In 2018, Gorski completed a standard form in which she assessed Anderson with marked limitations in each of the four areas of psychological functioning: understanding, remembering, or applying information; concentration, persistence, or maintaining pace; adapting or managing oneself; and interacting with others. Her assessment was at least partially consistent with Dr. Weber's 2016 psychological evaluation, in which he found that Anderson had up to a marked limitation in his abilities to respond appropriately to supervisors and coworkers and to withstand routine work stresses. Anderson argues that the ALJ erred by giving only some weight to these marked limitations and by favoring the opinions of the state agency doctors who reviewed the administrative record before Gorski had diagnosed Anderson with DID in November 2017.

At the time Anderson applied for benefits, nurse practitioners like Gorski were not considered acceptable medical sources, and therefore, Gorski's opinion not entitled to controlling wright even though she served as Anderson's primary treating provider. *Brumbaugh v. Saul*, __ F. App'x __, 2021 WL 1100562, at *3 (7th Cir. Mar. 23, 2021) (citing 20 C.F.R. § 404.1513(a)

10

(2013 vers.) (Noting regulations changed for claims filed on or after March 27, 2017). Therefore, the ALJ must provide only a sufficient explanation for his assessment of Gorski's opinion to allow Anderson to understand his reasoning. *Id.* (citing § 404.1527(f)(2)).

Generally, more weight is given to a medical opinion of an acceptable medical source who has examined the claimant. 20 C.F.R. § 404.1527(c). However, an ALJ is not required to give any special deference to the opinion of a consultative examiner. *Id.*; *Coffee v. Colvin*, 2015 WL 2405491, at *5 (S.D. Ind. May 19, 2015). In determining the degree of weight to afford any medical opinion not afforded controlling weight, an ALJ should consider the examining relationship, treatment relationship, length of the treatment relationship, and the frequency of examination, supportability, consistency, specialization, and other factors. 20 C.F.R. §§ 404.1527(c) and (f)(1); SSR 06-03p. The ALJ has met these minimal standards in this case.

The ALJ explained that even though Anderson displayed some poor judgment regarding money, it did not appear to be a pervasive problem for him, as he was able to manage a small antique trading business with his girlfriend. Although the ALJ agreed that Anderson suffered from moderate concentration deficits, he found little evidence in the record showing that these deficits warranted a marked limitation. Contrary to Anderson's contention, the ALJ explained his reasoning by pointing out that Anderson's overall condition was largely controlled through medications and that Anderson displayed adequate concentration during his appointments with Gorski and the consultative examination. In fact, Dr. Weber assessed Anderson with only mild limitations in his abilities to understand, remember, and carry out simple instructions and maintain concentration, attention, and work pace.

With respect to social interactions, the ALJ explained that apart from a reported conflict with some neighbors involving the police in 2016, there was little other evidence in the record to support Gorski's and Weber's conclusion that Anderson had marked difficulty interacting with others. Anderson argues that the ALJ mischaracterized the record because there is evidence that his girlfriend Linda had expressed concern about his outbursts on occasion, that he reported not being on speaking terms with his family, and that he told Gorski that he was unable to trust the police or anyone besides her. The record confirms that Anderson was having trouble with his neighbors and with angry outbursts in 2016. However, as the ALJ noted, these behaviors and symptoms improved with medication. On September 15, 2016, Anderson reported that his anxiety had worsened after stopping Zoloft and that he was unable to afford his medications, but when he saw Gorski again on October 6, 2016, he stated that the Seroquel and Sertraline he had started taking were very helpful in keeping him calm. On November 17, 2017, Anderson reported feeling "more mellow" on his medications as compared to having more aggressive "urges" that came on quickly when he was not on the medications.

The ALJ correctly noted that Anderson did not report any difficulty getting along with authority figures, and that there was no evidence of Anderson demonstrating significant difficulty interacting with supervisors. The ALJ also reasoned that even though Anderson had trouble working third shift, there was no evidence that he was unable to maintain employment during other time periods. As a result, the ALJ reasonably concluded that Anderson can maintain occasional interaction with supervisors and co-workers but could not have one-to-one interaction with the public on a sustained basis.

The ALJ explained that he gave great weight to the state agency consultant opinions because they were supported by the medical record. Anderson counters that the consultants issued their opinions prior to Anderson receiving Gorski's diagnosis of dissociative identity disorder (DID) in 2018. It is true that "ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (internal quotation marks omitted). But it is Anderson's burden to explain how the new evidence could have altered the consultants' opinions and the ALJ's decision. *See Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017).

The ALJ found Anderson's DID to be a severe impairment, so he considered it in assessing Anderson's RFC. Anderson has not explained how the existence of the DID diagnosis itself would have altered the ALJ's decision or the consultants' opinions. For example, he has not identified any additional limitations associated specifically with the new diagnosis. Moreover, both consultants had full access to all of Gorski's treatment records in which she discussed Anderson's dissociative episodes and their effect on him. Without more to show that DID was a significantly new diagnosis that could have changed the reviewing psychologists' opinions, the ALJ was entitled to rely on those opinions. As the Seventh Circuit has made clear in numerous cases, it is not the court's role to reconsider the weight given to the various medical opinions. *See, e.g.*, *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018); *Brumbaugh*, 2021 WL 1100562, at *3-4.

In sum, Anderson has failed to make a convincing argument that the ALJ did not have good reasons for discounting the work-preclusive limitations assessed by Gorski and Weber.

Further, to the extent that any one of the ALJ's specific reasons may have been incorrect, the error would not be grounds for remand because the ALJ cited several valid reasons to discount their opinions. *See Simila v. Astrue*, 575 F.3d 503, 516 (7th Cir. 2009).

## II. Listing Analysis

In a brief argument, Anderson contends that the ALJ erred at step three of the evaluation process by failing to properly consider whether the severity of his impairments, either singly or in combination, met or medically equaled Listings 12.04 (Depressive and Bipolar Disorders), 12.08 (Personality and Impulse Control Disorders), 12.11 (Neurodevelopmental Disorders), and 12.15 (Trauma and Stressor Disorders). As the claimant, Anderson has the burden of showing that his impairments satisfy all of the criteria specified in the listings. 20 C.F.R. §§ 404.1512(a), 404.1525, 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award" of benefits at step three). In order to meet or medically equal the paragraph B criteria for each of these listings, Anderson must show that his mental impairments resulted in one extreme or two marked limitations in the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00 *et seq*.

Anderson points out that Gorski and Weber found him to be markedly limited in the areas of mental functioning related to concentration, memory, and interactions with others and that there were repeated notations of his reported difficulties in these areas in the record.

Although the ALJ recognized Anderson's difficulties in his opinion, he found that at most, Anderson had only moderate limitations in these areas. As discussed above, the ALJ explained that Anderson's memory problems are largely corrected by medication, he frequently displayed adequate concentration at his clinical visits with Gorski, he did not have any difficulty concentrating during his consultative examination with Weber, and he did not report or present any evidence that he had difficulty getting along with authority figures. AR 16-17. The ALJ also discussed these issues in conjunction with his RFC assessment and provided good reasons for discounting the extreme limitations assessed by Gorski and Weber.

In addition, Anderson has failed to articulate how the evidence showed that he satisfied any of the other requirements of the listings he identifies. For example, to satisfy Listing 12.05, he must show either very low I.Q. scores, or an intelligence so low that it cannot even be tested. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(A), (B)(1). Anderson has not attempted to make this showing. In his reply brief, Anderson argues that he has at least met the additional requirements for Listing 12.06 related to anxiety disorder because he reported symptoms such as easy aggravation, unrealistic plans, decreased need for sleep, distractibility, and impulsivity. However, arguments made for the first time in a reply brief are considered waived. *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that skeletal arguments may be properly treated as waived, as may arguments made for the first time in reply briefs[.]"). Accordingly, Anderson has failed to carry his burden of showing that the ALJ's step three findings are not well-supported by the evidence in the record.

**III. Conclusion**

In sum, the ALJ did not ignore a line of evidence contradicting his decision, his assessment of Anderson's self-reported symptoms was not patently wrong, and he did not fail to note any supported limitations. The ALJ's decision was thus supported by substantial evidence. Therefore, I am affirming the decision of the ALJ and dismissing Anderson's appeal.

**ORDER**

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying plaintiff James Anthony Anderson, Jr.'s application for disability benefits, is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 29th day of April, 2021.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge